UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

WILLIAM HERNANDEZ,

                        Plaintiff,

           v.

COUNTY OF NASSAU, P.O.s JOHN DOE #1-10,
*individually and in their official capacities, (the*
*name John Doe being fictitious, as the true names*
*are presently unknown)*, P.O. CHRISTOPHER
KARMAN, P.O. PATRICK ZUMMO, P.O. GARY
DIPASQUALE, and P.O. JUSTIN NASH,

                     Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-1646 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff William Hernandez commenced the above-captioned action on March 23, 2017, against Defendants the County of Nassau (the "County") and Police Officers John Doe #1-10, individually and in their official capacities. (Compl., Docket Entry No. 1.) On December 5, 2017, Plaintiff filed an Amended Complaint, adding Defendants Officers Christopher Karman, Patrick Zummo, Gary DiPasquale, and Justin Nash, and asserting claims of false arrest, malicious prosecution, malicious abuse of process, fabrication of evidence, denial of medical care, use of excessive force, and failure to intervene pursuant to 42 U.S.C. § 1983; a claim of racial discrimination pursuant to 42 U.S.C. § 1981; various state law claims against the individual officers; and a municipal liability claim against the County. (Am. Compl., Docket

Entry No. 18.)  On October 4, 2019,[1] Defendants moved for summary judgment, and Plaintiff opposed the motion.[2]

For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.  The Court grants Defendants' motion as to Plaintiff's federal and state claims for false arrest, federal and state claims for malicious prosecution, federal and state claims for malicious abuse of process, federal claim for fabrication of evidence, federal claim for racial discrimination under 42 U.S.C. § 1981, federal claim for municipal liability, and federal claims for "general constitutional violations under 42 U.S.C. § 1983."  The Court denies Defendants' motion as to Plaintiff's federal claim for denial of medical care, federal claim for excessive force, state claims for assault and battery, and federal claim for failure to intervene based on the alleged excessive force incident at the precinct.

## I.   Background

### a.   Factual Background

The following facts are undisputed unless otherwise noted.[3]

---

[1]  The case was reassigned to the undersigned on June 11, 2021.

[2]  (Defs.' Mot. for Summ. J., Docket Entry No. 59; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 59-2; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 59-5.)

[3]  (Defs.' Stmt. of Material Facts ("Defs.' 56.1"), Docket Entry No. 59-1; Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ("Pl.'s 56.1 Resp."), Docket Entry No. 59-3; Pl.'s Additional Material Facts ("Pl.'s 56.1"), Docket Entry No. 59-3; Decl. of Ralph J. Reissman in Supp. of Defs.' Mot. ("Reissman Decl."), Docket Entry No. 59; Decl. of Rose M. Weber in Opp'n to Defs.' Mot. ("Weber Decl."), Docket Entry No. 59-4.)

### i. Events giving rise to Plaintiff's arrest

In January of 2016, Plaintiff was living in Westbury, New York, with his boyfriend, Misael Cruz ("Cruz"). (Defs.' 56.1 ¶ 3). Officers Zummo, Karman, DiPasquale, and Nash were all police officers in the Nassau County Police Department. (*Id.* ¶¶ 4, 6, 8, 10.) On January 1, 2016, Officers Zummo and Karman were working a 7:00 PM to 7:00 AM shift, in uniform, and were riding together in a marked patrol car. (*Id.* ¶¶ 5, 7.) Officer DiPasquale was working the same shift, in uniform, and was riding alone in a marked patrol car, (*id.* ¶ 9), and Officer Nash was working a 7:00 PM to 5:00 AM shift, in uniform, and was riding alone in a marked patrol car, (*id.* ¶ 11).

At approximately 10:50 PM, three men, Plaintiff, Cruz, and an unidentified male, robbed Carlos Ouidio Larios ("Larios" or the "victim") in the parking lot of the Taverez Deli, located at 789 Old Country Road, Westbury, New York. (Defs.' 56.1 ¶ 12;[4] Nassau County Police Department Case Report ("Case Report"), annexed to Reissman Decl. as Ex. F, Docket Entry No. 59, at 452.) According to Larios, the three assailants threw him to the ground, and while two of them got on top of him and held a long metal object against his stomach, threatening to kill him, one of them stole his cellphone and $100. (Case Report 3.) Larios started to chase after them until one of the assailants turned back and threatened again to kill him. (*Id.*) Shortly after they left, Larios called 911. (*See* Nassau County Police Department Event Search, annexed to Weber Decl. as Ex. A, Docket Entry No. 59-4, at 1.)

Officer Nash received a radio call assignment for a robbery in progress and was the first to arrive at the scene. (Defs.' 56.1 ¶ 13.) Officer DiPasquale also responded to the call and went to the scene. (*Id.* ¶ 14.) Officers Karman and Zummo heard the radio call for a robbery with a

---

[4] Plaintiff denies that he committed the robbery. (Pl.'s 56.1 Resp. ¶ 12.)

weapon, which included a description of two of the possible suspects, and responded to the call to help canvas the area. (*Id.* ¶ 15.) Officers Karman and Zummo saw Plaintiff and Cruz on Grand Boulevard and stopped to speak to them. (*Id.* ¶ 16.) The officers told Plaintiff and Cruz to sit down, at which point the officers confirmed that the description provided was "very similar to what they were wearing." (Dep. of Patrick Zummo ("Zummo Dep."), annexed to Reissman Decl. as Ex. B, Docket Entry No. 59, at 154, 15:5–12.) Officer Zummo searched the grass around them using a flashlight and, within a minute or two, found a screwdriver on the ground within ten feet of them. (*Id.* 18:10–15; 20:7–10; 27:3–7.) Officer Karman saw Officer Zummo find the screwdriver in the grass within five feet from where Hernandez and Cruz were standing when stopped. (Dep. of Christopher Karman ("Karman Dep."), annexed to Reissman Decl. as Ex. C, Docket Entry No. 59, at 219, 21:20–22:2; 22:14–15; 23:5–7.)

Officer Nash heard over the radio that two subjects had been stopped and drove the victim to that location for a "show up," at which point Larios positively identified Plaintiff and Cruz as two of the men who had robbed him. (Defs.' 56.1 ¶ 18.) After the identification by the victim, Plaintiff and Cruz were placed under arrest and handcuffed. (Karman Dep. 19:16–20.) Plaintiff was transported to the Third Precinct and Officer Karman was designated as Plaintiff's arresting officer on the Arrest Report and Felony Complaint. (Defs.' 56.1 ¶ 21; Felony Compl., annexed to Reissman Decl. as Ex. K, Docket Entry No. 59, at 468.)

Plaintiff disputes that he and Cruz matched the description of the perpetrators. (Pl.'s 56.1 Resp. ¶ 16), pointing to descriptions of the assailants given by the victim, which Plaintiff claims

are inconsistent.[5]  The first entry in the police records, which appears to have been relayed by the emergency operator, states as follows:

> Male lang barrier. States 3 m/h threw him to the floor and held a weapon to his stomach took 100 usc and Samsung cell phone one wearing a wht sweater and wht pajama pants/blue jeans and blk sweater/blk sweater [sic] and hoodie over it[.]

(Nassau County Police Department Event Search 4–5 (emphasis omitted).)  Subsequently, two entries on the dispatch log containing information from Officer Nash, designated as "321," (Dep. of Justin Nash ("Nash Dep."), annexed to Reissman Decl. as Ex. E, Docket Entry No. 59, at 365, 24:23–24), appear with the following timestamps:

> 22:57:53 – 321   3 m/h fled n.b[.] on Dayton . . . .  No injury to victim . . . one white sweater one blue sweater w jeans
>
> 22:59:13 – 321   No inj to compl — subjs fled n/b Dayton – 23-33 YOA — all wearing blue jeans — one wearing blue sweater, one white sweater — no weapons seen[.]

(Nassau County Police Department Event Search 6 (emphasis omitted).)  In the early hours of January 2, 2016, after Plaintiff was arrested, Larios filled out two Police Department forms entitled "Supporting Deposition" in which he confirmed that he positively identified Plaintiff and Cruz as two of his assailants at a show-up, stating that one was wearing a "Black jacket, Black pants," and the other a "Grey sweater, Grey sweatpants."  (Police Department Supporting Deps., annexed to Reissman Decl. as Ex. I, Docket Entry No. 59, at 462–63.)  The Arrest Reports indicate that Plaintiff was wearing a black jacket, maroon sweater, and blue jeans, (Pl. Arrest

---

[5]  Plaintiff cites a document entitled "Nassau County Police Department Event Search," which was apparently produced as part of the Nassau County District Attorney's file.  (Nassau County Police Department Event Search, annexed to Weber Decl. as Ex. A, Docket Entry No. 59-4, at 4–7.)  Because the exhibits to the Weber Declaration are not consecutively paginated, the Court refers to the page numbers assigned by the electronic case filing system.

Report, annexed to Reissman Decl. as Ex. J, Docket Entry No. 59, at 465), and Cruz was wearing

a white, hooded sweatshirt with black pants, (Cruz Arrest Report, annexed to Weber Decl. as Ex.

A, Docket Entry No. 59-4, at 8).  At his deposition, Plaintiff stated that Cruz was wearing a

white sweater and a gray windbreaker.  (Dep. of William Hernandez ("Pl.'s Dep."), annexed to

Reissman Decl. as Ex. A, Docket Entry No. 59, at 6, 57:7–8.)

      Plaintiff also disputes whether a "weapon" was actually discovered at the location where

the arrest took place.  Another officer, Thomas Price, testified that Officer Karman told him there

was a screwdriver and asked him to look for it.  (Dep. of Thomas Price ("Price Dep."), annexed

to Weber Decl. as Ex. B, Docket Entry No. 59-4, at 17, 15:17–22.)  Officer Price searched for

five to ten minutes, five to ten feet "in either direction of where somebody would have tossed or

thrown it" and did not find it, noting that the grass in that area was tall.  (*Id.* 15:12–16:24.)

Officer Zummo testified that he does not believe he picked up the screwdriver but that detectives

came out and got it.  (Zummo Dep. 21:15–21; 22:2–6; *see also* Screwdriver Photographs,

annexed to Reissman Decl. as Ex. H, Docket Entry No. 59, at 459–60.)

      **ii.   Post-arrest events at the precinct**

      At the time of his arrest, Plaintiff identified himself to the officers as "Roberto Cruz"

with a false date of birth of February 2, 1985.  (Defs.' 56.1 ¶ 22.)  Defendants claim that Plaintiff

continued to provide a false name and birthdate after he was advised several times that it is a

crime to give the police false information.  (*Id.*)  Plaintiff admits that he gave a false name

initially at the time of his arrest but testified that he corrected the information in the police car

and at the precinct.  (Pl.'s 56.1 Resp. ¶ 22; Pl.'s Dep. 33:12–18.)  Although Plaintiff argues that

he gave the officers a false name once, he does not reference the fictitious birthdate.  (*See* Pl.'s

56.1 Resp. ¶¶ 22–23.)

The parties disagree as to what happened after Plaintiff arrived at the precinct.

Defendants contend that while being held in a detention cell, Plaintiff did not complain about any

illness or needing medical attention but did exhibit suicidal conduct.  (Defs.' 56.1 ¶¶ 25–27.)

Plaintiff was pulling his pants down and stating that he wanted to hang himself.  (*Id.* ¶ 25.)

Officer Nash observed him banging his head against the wall of the cell and went in to stop him.[6]

(Nash Dep. 32:12–33:22.)  In response to Plaintiff's suicidal statements, a determination was

made to transport him to a hospital for evaluation.  (Karman Dep. 33:13–20.)  Officers Nash and

DiPasquale transported Plaintiff, who was seated in the rear passenger seat of the transport

vehicle, to Nassau County Medical Center ("NUMC") for a medical evaluation to determine if

he was fit for confinement.  (Defs.' 56.1 ¶ 28.)

Plaintiff testified that while in detention, he repeatedly requested medical attention,

including access to his asthma medication.  (Pl.'s 56.1 Resp. ¶ 26; Pl.'s Dep. 42:21–25, 46:2–12;

*see also* Pl.'s Dep. 41:11–15 ("I kept complaining about my asthma, because I was having

anxiety, my heart was running, and I guess they took it that it wasn't serious, and I was trying to

tell them . . . I couldn't breath[e].").)  He admitted that he made statements about wanting to

hang himself but testified that he did so to get the officers' attention so that they would provide

him with medical care.  (Pl.'s Dep. 90:6–9.)  Plaintiff also admitted that the officers "might have

---

[6]  In addition to Officer Nash, Officer DiPasquale testified that he and Officer Karman
were outside the cell when Plaintiff asked for his belt in order to kill himself, (Dep. of Gary
DiPasquale ("DiPasquale Dep."), annexed to Reissman Decl. as Ex. D, Docket Entry No. 59, at
286, 29:2–24), and Officers DiPasquale and Karman, and possibly Officers Nash and/or Zummo
entered the cell and pushed Plaintiff against the wall so he could not hurt himself, (*id.* 30:8–11,
32:5–32).  Officer Zummo testified that he entered the cell, possibly to do a search, (Zummo
Dep. 44:2–5), but could not remember if there were issues regarding Plaintiff's statements and
conduct during his time in the cell, (*id.* 43:4–15).  Officer Karman testified that he heard
Plaintiff's suicidal statements, (Karman Dep. 32:22–33:4), and knew that officers entered the cell
at some point but could not recall if he entered the cell himself, (*id.* 35:7–17).

believed his statement about wanting to hang himself," (Pl.'s 56.1 Resp. ¶ 27), and conceded that it was possible he took some of his clothes off by himself because when he gets frustrated "I tend to want to take my clothes off," (Pl.'s Dep. 59:18–21).  Instead of responding to his requests for medical attention, the officers told him he was not sick, and between three and five officers entered the detention cell, ripped off his clothes, and beat him, punching him and hitting his head against the wall.  (*Id.* 41:19–22, 44:24–45:16.)  Plaintiff could not remember which officers assaulted him, only that they were light-skinned Caucasian.  (*Id.* 46:18–24.)  After the assault, officers took Plaintiff from the cell wearing only his boxer shorts and no shoes and put him in the backseat passenger side of a vehicle.  (*Id.* 51:9–52:6.)  He was experiencing pain in his head and chest but was not bleeding.  (*Id.* 53:10–24.)  Plaintiff contends that he was taken to NUMC for treatment of the injuries he suffered due to the assault in the cell.  (Pl.'s 56.1 Resp. ¶ 28.)

### iii.   Transportation to and treatment at NUMC

The parties also present differing accounts of what transpired during the trip to NUMC. According to Officer DiPasquale, who was driving, Plaintiff "started flipping out, slamming his head violently into the window at least four times.  He tried to lean forward and choke himself with the seat belt, flailing around like crazy."  (Defs.' 56.1 ¶ 29.)  As the car crossed Merrick Avenue into Eisenhower Park, Officer DiPasquale stopped the car.  (*Id.* ¶ 30.)  Officers Nash and DiPasquale removed Plaintiff from the car and sat him down, subsequently placing him on his stomach because he kept trying to stand up.  (*Id.* ¶ 31.)  When Plaintiff began hitting the side of his head into the ground, the officers held his head down to restrain him.  (*Id.*)  Officer DiPasquale called an ambulance, and Plaintiff was placed on a stretcher, strapped down, and transported to NUMC without further incident.  (*Id.* ¶¶ 32–33.)

8

According to Plaintiff, the only thing that happened in the car while it was in motion was Defendants' taunting of him, with the use of derogatory language such as "faggot" and "gay." (Pl.'s 56.1 Resp. ¶ 29; Tr. of Pl.'s § 50-h Hearing dated Aug. 18, 2016, annexed to Weber Decl. as Ex. E, Docket Entry No. 59-4, at 33, 32:2–5.)  Plaintiff contends that he never banged his head off any inside part of the vehicle.  (Pl.'s Dep. 79:14–19.)  Rather, Defendants stopped the car in a dark part of the park, punched him while he was seated in the vehicle, then ripped him out of the vehicle and violently assaulted him, including kicking, punching, and stomping on him.  (Pl.'s 56.1 Resp. ¶¶ 30–31; Pl.'s Dep. 80:18–81:16, 83:17–25.)  While he was on the ground, they were kicking him "and laughing and saying, now you really gonna be sick, now [we] have a reason to take you to the hospital."  (Pl.'s Dep. 84:8–12.)  Plaintiff contends that Defendants called for an ambulance five minutes after they stopped the vehicle in the park.  (Pl.'s 56.1 Resp. ¶ 32.)  When the ambulance arrived, he was bleeding from his right jaw by his ear and from scratches all over his body.  (Pl.'s Dep. 88:10–22.)

Upon arrival at NUMC, Plaintiff was treated for scrapes and a fracture of the right side of his jaw.  (Pl.'s Dep. 95:11–24, 96:3–8; *see also* Pl.'s Opp'n 5.)  He was evaluated by doctors, found to be "fit for confinement," and returned to the Third Precinct at approximately 6:30 AM. (Defs.' 56.1 ¶¶ 34–35; Pl.'s 56.1 Resp. ¶ 35.)

### iv.  Charges and disposition

Plaintiff was arrested on a charge of robbery in the first degree in violation of New York Penal Law § 160.15(3) in a felony complaint.[7]  (Defs.' 56.1 ¶ 36; Felony Compl.)  On January 8,

---

[7]  "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (3) [u]ses or threatens the immediate use of a dangerous instrument."  N.Y. Penal Law § 160.15(3).

2016, a grand jury did not return an indictment on any of the charges considered against Plaintiff

but directed the District Attorney to file a Prosecutor's Information charging him with the crime

of false personation in violation of New York Penal Law § 190.23.  (*See* Defs.' 56.1 ¶¶ 37–38.)

Pursuant to the grand jury's direction, a Prosecutor's Information was filed on January 11, 2016,

stating that Plaintiff, "after being informed of the consequences of such act, did knowingly

misrepresent his actual name, date of birth or address to a police officer or peace officer with

intent to prevent such police officer or peace officer from ascertaining such information."

(Prosecutor's Information, annexed to Reissman Decl. as Ex. L, Docket Entry No. 59, at 470.)

The false personation charge was dismissed on July 10, 2017, pursuant to New York Criminal

Procedure Law § 170.30(1)(e).[8]  (Defs.' 56.1 ¶ 39; Nassau County District Attorney's Office File

Jacket, annexed to Reissman Decl. as Ex. N, Docket Entry No. 59, at 476–79.)

### b.  Procedural background

Plaintiff commenced this action on March 23, 2017, and filed an Amended Complaint on

December 5, 2017.  (Compl.; Am. Compl.)  The Amended Complaint asserts eighteen claims,

including nine federal causes of action and nine claims for violation of New York state law.

Plaintiff's federal claims include false arrest, malicious prosecution, malicious abuse of process,

fabrication of evidence, denial of medical care, use of excessive force, and failure to intervene

under 42 U.S.C. § 1983; municipal liability under *Monell*; and racial discrimination under 42

U.S.C. § 1981.  (Am. Compl. ¶¶ 34–95.)  Plaintiff asserts claims under state law for false arrest,

assault, battery, malicious prosecution, malicious abuse of process, intentional infliction of

---

[8]  "After arraignment upon an information, a simplified information, a prosecutor's information or a misdemeanor complaint, the local criminal court may, upon motion of the defendant, dismiss such instrument or any count thereof upon the ground that: . . . (e) [t]he defendant has been denied the right to a speedy trial . . . ."  N.Y. Criminal Procedure Law § 170.30(1)(e).

10

emotional distress, negligent infliction of emotional distress, negligent hiring and retention, and negligent training and supervision.  (*Id.* ¶¶ 98–161.)

Defendants moved for summary judgment on all of Plaintiff's claims.  (Defs.' Mot. for Summ. J.)  In his opposition, Plaintiff withdraws his state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent hiring, retention, training, and supervision.[9]  (Pl.'s Opp'n 24.)

## II.   Discussion

### a.   Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury

---

[9] Based on Plaintiff's withdrawal, the Court dismisses Plaintiff's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent hiring, retention, training, and supervision.

could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

      **b.**   **Section 1983 claims**

      Under section 1983, individuals may bring a private cause of action against persons "acting 'under color of state law'" to recover money damages for deprivations of their federal or constitutional rights.  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983).  To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations omitted); *see also Collymore v. City of New York*, 767 F. App'x 42, 45 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 87–88).

      **i.**   **False arrest/false imprisonment claims**

      Defendants argue that they are entitled to summary judgment on Plaintiff's federal and state false arrest claims because (1) they had probable cause to arrest Plaintiff based on the sworn statements and identification by the victim, (Defs.' Mem. 13), and (2) there was arguable probable cause for the arrest and thus they are entitled to qualified immunity, (*id.* at 16–17).

      Plaintiff argues that (1) there was no probable cause to arrest him based on the victim's statements because his descriptions of the suspects were uncorroborated and also varied and thus were unreliable, (Pl.'s Opp'n 8–12), and (2) qualified immunity is unavailable where there are

factual disputes, (*id.* at 15–16). In addition, Plaintiff argues that the fact that Defendants fabricated evidence is reason enough to deny qualified immunity as to the false arrest claims. (*Id.* at 18.)

In assessing Fourth Amendment claims of false arrest[10] brought under section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007); *see also Dalessio v. City of Bristol*, 763 F. App'x 126, 128 (2d Cir. 2019). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (alteration in original) (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021); *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019). "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Spagnuolo v. Howell*, 814 F. App'x 614, 616–17 (2d Cir. 2020) ("Probable cause is a complete defense to a constitutional or New York tort claim for false arrest and false imprisonment . . . ."); *Boyler v. City of Lackawanna*, 765 F. App'x 493, 496 (2d Cir. 2019) ("Probable cause is a complete defense to false arrest . . . claims under

---

[10] Because "[f]alse arrest and false imprisonment are considered one tort," *Frederick v. City of New York*, No. 13-CV-897, 2016 WL 8711395, at *8 n.19 (E.D.N.Y. Mar. 25, 2016) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)), the Court addresses these issues together as one claim, *see Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *6 (S.D.N.Y. Nov. 29, 2004) ("[T]he claims of false arrest and false imprisonment are 'synonymous' . . . ." (quoting *Posr*, 944 F.2d at 100)), *aff'd*, 173 F. App'x 893 (2d Cir. 2006).

both § 1983 and New York law."); *Thompson v. City of New York*, 592 F. App'x 36, 37 (2d Cir. 2015) (same); *Killburn v. Village of Saranac Lake*, 413 F. App'x 362, 363 (2d Cir. 2011) (noting same and adding that this also "holds true for . . . false imprisonment claims because, under New York law, the claim is identical to a false arrest claim, and the federal claim looks to the elements of the state claim" (citation omitted)).  "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Kee*, 12 F.4th at 158 (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)); *Spagnuolo*, 814 F. App'x at 617 (same); *Simpson*, 793 F.3d at 265 (same).  "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.'"  *Kee*, 12 F.4th at 158 (quoting *Ashley*, 992 F.3d at 136); *Harrison v. County of Nassau*, 804 F. App'x 24, 27 (2d Cir. 2020) (same).  The question is whether the facts known to the arresting officer, at the time of the arrest, objectively support a finding of probable cause to support the arrest.  *Gonzalez v. Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).

### A.   Probable cause

It is well-established that a law enforcement officer has "probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth."  *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (quoting *Miloslavsky v. AES Eng'g Soc'y*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993)); *see also Williams v. City of New York*, 683 F. App'x 57, 59 (2d Cir. 2017) (holding that "the circumstances known to the arresting officers in each of the three arrests did not 'raise doubts as to [the victim's] veracity' such that the officers were

14

unjustified in relying on [the victim's] accusations" as the basis for probable cause (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995))).  "[A]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause."  *Keith v. City of New York*, 641 F. App'x 63, 65 (2d Cir. 2016) (alteration in original) (quoting *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013)); *see also Heyliger v. Peters*, 771 F. App'x 96, 97 (2d Cir. 2019) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006))); *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (same).

   The officers had probable cause to arrest Plaintiff, which defeats both his section 1983 and state false arrest claims.  Plaintiff does not suggest that Larios had some personal agenda or motivation that should have given the officers cause to doubt his statements or his identification of Plaintiff.  *See, e.g.*, *Sankar v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) (further investigation warranted beyond the victim's identification where officer was "aware of the contentious relationship" between the victim and the accused which could have provided a motive for a false accusation).  Instead, Plaintiff argues that the discrepancies in the victim's descriptions of the clothing worn by the purported assailants should cast doubt on the reliability of the victim's identification of Plaintiff and Cruz at the show-up, (Pl.'s Mem. 8–12), but any discrepancy does not undermine the reasonableness of the officers' reliance on the identification.

   There were three police dispatches prior to the arrests.  According to the NCPD Event Search, an emergency operator indicated the time of the call, the caller (Carlos), the location, and the trunk number.  The remarks included: "Male lang barrier.  States 3 m/h threw him to the floor

15

and held a weapon to his stomach . . . [,] one wearing a wht sweater and wht pajama pants/blue

jeans and blk sweater/blk sweater [sic] and hoodie over it." (Nassau County Police Department

Event Search 4–5 (emphasis omitted).)  In addition to noting that there was a language barrier,

and providing generalized clothing descriptions, it is unclear whether the descriptions pertained

to one, two, or all three assailants.  The next two dispatches contained information relayed by

Officer Nash based on his interviews with the victim.  These dispatches provided consistent

information regarding clothing worn by two of the assailants — a blue sweater and blue jeans,

and a white sweater with blue jeans.[11]  (*Id.*)  The arrest reports show that Plaintiff was wearing a

black jacket, maroon sweater, and blue jeans, and Cruz was wearing a white hooded sweater and

a gray windbreaker.  (Pl. Arrest Report; Cruz Arrest Report.)  While not an exact match to the

descriptions given to the officers, they are sufficiently similar for the officers to have reasonably

believed that Plaintiff and Cruz were two of the perpetrators.  Thus, the officers had no basis to

question the truthfulness of the victim based on the clothing descriptions.

Moreover, in addition to a clothing description that was similar to the clothing worn by

Plaintiff and Cruz, the Officers had an identification of both individuals.  The victim made a

sworn identification of Plaintiff and Cruz as two of the three men who committed the robbery.

Thus, regardless of any purported discrepancy in the clothing descriptions, the victim's

identification of Plaintiff and Cruz as two of the three individuals who robbed him separately

---

[11]  As only the information available at the time the arrest was made is relevant to a probable cause determination, Plaintiff cannot rely on alleged discrepancies that appear in documents memorializing the victim's statements made to other officers *after* the arrests, as those statements could not have been used by the arresting officers to raise questions regarding the victim's veracity.  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.'" (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021))); *Harrison v. County of Nassau*, 804 F. App'x 24, 27 (2d Cir. 2020) (same).

16

provided probable cause for Plaintiff's arrest. *See Stansbury*, 721 F.3d at 94 (finding that deficiency in witness's description, "if it was one, was overcome by other evidence, including a positive, sworn identification by the same [witness]"); *Davenport v. City of New York*, No. 15-CV-5890, 2017 WL 4356883, at *12 (E.D.N.Y. Sept. 28, 2017) (finding that discrepancies of eight inches in height, hair length, and complexion in victim's description were "within the bounds of Plaintiff's weight and age" and victim's identification "was unequivocal"); *O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, at *10 (S.D.N.Y. Mar. 22, 2013) (collecting cases in which witnesses' statements contributed to probable cause determinations despite inconsistencies within those statements); *see also Fogelman v. Donato*, 111 F. Supp. 3d 282, 286 (E.D.N.Y. 2015) (finding that discrepancy in witness statement about date of assault did not "seriously implicate" the victim's credibility and noting there was no alleged motive to fabricate on the part of the victim). *See generally Norwood v. Mason*, 524 F. App'x 762, 765 (2d Cir. 2013) (noting that "New York courts routinely hold that a victim's photo identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable"). Based on the totality of the circumstances, even viewing the evidence in the light most favorable to Plaintiff, the officers had probable cause for his arrest.

The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's federal and state false arrest claims.[12]

---

[12] Because the Court finds that there was probable cause to arrest Plaintiff, it declines to consider whether Defendants are entitled to qualified immunity.

###### ii.   Malicious prosecution claims

Defendants argue that they are entitled to summary judgment on Plaintiff's malicious prosecution claims because (1) there was continuing probable cause to prosecute since there is nothing in the record to negate the determination of probable cause for the arrest; (2) there is no evidence of malice, (Defs.' Mem. 15); and (3) the officers are entitled to qualified immunity, (*id.* at 16–17).

Plaintiff argues that (1) he has presented two malicious prosecution claims — one pertaining to the robbery charge and the other to the false personation charge — and that probable cause was lacking for both, (Pl.'s Opp'n 12); (2) the lack of probable cause raises an inference of malice, (*id.* at 13); and (3) qualified immunity is not warranted in light of the issues of fact and Defendants' falsification of evidence, (*id.* at 18).

The Second Circuit has clarified that "federal law defines the elements of a § 1983 malicious prosecution claim, and that a [s]tate's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018).  "To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice.'"  *Kee*, 12 F.4th at 161–62 (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)); *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) (same).  However, under section 1983, a plaintiff is required to show an "affirmative indication[] of innocence to establish 'favorable termination,'" *Lanning*, 908 F.3d at 25, and under state law, the favorable termination element is satisfied "so long as the circumstances surrounding the termination are not

18

inconsistent with the innocence of the accused," *id.* (quoting *Cantalina v. Danner*, 96 N.Y.2d 391, 395 (2001)). Because the lack of probable cause is an element of a malicious prosecution claim, "probable cause is a complete defense against a claim for malicious prosecution." *Ashley*, 992 F.3d at 128 (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)); *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (same). "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action." *Kee*, 12 F.4th at 166 (citation omitted) (first citing *Savino*, 331 F.3d at 72; then citing *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991); and then citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). "Thus, probable cause to prosecute should not be conflated with probable cause to arrest." *Id.* (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)); *cf. id.* at 158 ("[W]hen faced with a claim for false arrest, we focus on the validity of the arrest, and not on the validity of each charge." (quoting *Jaegly*, 439 F.3d at 154)).

### 1.   False personation charge

The false personation charge[13] was not part of the felony complaint and was brought pursuant to a Prosecutor's Information at the express direction of the grand jury. (*See* Felony Compl.; Prosecutor's Information.) "The fact that the grand jury directed the filing of a prosecutor's information establishes a prima facie case of probable cause." *Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 268 (W.D.N.Y. 2013) (quoting *Schero v. Merrola*, No. 74-CV-1361, 1974 WL 904, at *2 (S.D.N.Y. July 2, 1974)). A plaintiff may overcome the presumption of probable cause only by presenting evidence that "the indictment was the product of fraud,

---

[13]   Plaintiff appears to assert that the malicious prosecution claim on the false personation charge is brought only against Officer Karman, who "prosecuted [P]laintiff." (Pl.'s Opp'n 12.)

perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith." *Debrosse v. City of New York*, 739 F. App'x 48, 50 (2d Cir. 2018) (quoting *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015)).

Plaintiff does not cite to any evidence that a false statement was made by Officer Karman or any other Defendant as to the false personation charge. Nor does Plaintiff suggest that there was misconduct before the grand jury. Since the grand jury determined, after hearing testimony, to direct the District Attorney to file the false personation charge, it is reasonable to infer that some relevant testimony concerning the charge was provided to the grand jury during that proceeding. However, any such testimony, whether given by Officer Karman or any other officer, cannot form the basis of section 1983 liability under the Supreme Court's decision in *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012).[14] Accordingly, even if Plaintiff had presented evidence of false testimony before the grand jury, that evidence alone would not rebut the probable cause presumption. *See Eigner v. Jaeger*, No. 13-CV-3582, 2016 WL 11469503, at *4 (E.D.N.Y. Mar. 28, 2016) (collecting cases and stating that in light of *Rehberg*, a plaintiff "cannot rely on allegedly false grand jury testimony to rebut the presumption of probable cause arising from his indictment").

Moreover, while a plaintiff may have alternative routes of establishing evidence of bad faith sufficient to rebut the presumption, Plaintiff has not presented any evidence to rebut the

---

[14] In *Rehberg*, the Supreme Court held that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). This immunity attaches even if the testimony is false and given by a police officer. *See Adamou v. Doyle*, 707 F. App'x 745, 746 (2d Cir. 2018) (noting that under *Rehberg*, "a grand jury witness, including a law enforcement officer, 'has absolute immunity from any § 1983 claim based on the witness' testimony,' even if that testimony is perjurious" (quoting *Rehberg*, 566 U.S. at 369)).

20

presumption.  *See, e.g.*, *id.* ("*Rehberg* does not preclude [the plaintiff] from relying on

'allegations of bad faith conduct outside the grand jury' — such as false statements in the

criminal complaint — to rebut the presumption of probable cause." (quoting *Nickey v. City of*

*New York*, No. 11-CV-3207, 2013 WL 5447510, at *7 (E.D.N.Y. Sept. 27, 2013))).  In addition,

because the Felony Complaint signed by Officer Karman pertains only to the robbery charge

without any reference to Plaintiff's failure to properly identify himself, Plaintiff cannot rely on

any alleged falsehood in that document to support his malicious prosecution claim.  *Nickey*, 2013

WL 5447510, at *8–9 (noting that in some circumstances where there is no evidence that an

indictment was procured by fraud or other misconduct, "the only basis for a malicious

prosecution claim . . . centers on the probable cause available at the time [the defendant] initiated

proceedings by way of felony complaint"); *see also Carr v. City of New York*, No. 11-CV-6982,

2013 WL 1732343, at *6 (S.D.N.Y. Apr. 19, 2013) (noting that *Rehberg* does not protect

allegedly false statements made in a criminal complaint); *Del Col v. Rice*, No. 11-CV-5138, 2012

WL 6589839, at *14 n.19 (E.D.N.Y. Dec. 18, 2012) ("While *Rehberg v. Paulk* holds that grand

jury testimony cannot be the sole basis for a § 1983 claim, courts have allowed malicious

prosecution claims to proceed[] where [they] are based on more than false grand jury

testimony.").

          Finally, Plaintiff argues there was no probable cause to prosecute him for false

impersonation because "there is a material issue of fact" — namely, Defendants claim that he

"repeatedly gave a false name" after being advised it is a crime to do so and Plaintiff "states that

he gave the false name only once and immediately corrected himself when warned of the

consequences."[15]  (Pl.'s Opp'n 12–13.)  In support, Plaintiff cites page 33 of his deposition.

(Pl.'s 56.1 Resp. ¶ 22 (citing Pl.'s Dep. 33).)  However, Plaintiff did not testify that he gave the

false name only once or that he made the correction after he was warned of the consequences of

providing false information; rather, he testified that he gave a false name when he was stopped,

and that the first time he corrected this was when he was in the police vehicle:

> Q:  Did they ask you what your name was?
> A:  Yes.
> Q:  What name did you give them?
> A:  I gave Roberto Cruz.
> Q:  Are you Roberto Cruz?
> A:  No, I'm not.
> Q:  Why did you give them the name Roberto Cruz?
> A:  I was having anxiety.  I was nervous already, so — but I corrected myself in the vehicle and at the precinct.
> Q:  So the first time that you mentioned that your name was not Roberto Cruz was while you were in the police vehicle?
> A:  Yes.
> Q:  This was immediately after they had stopped you?
> A:  Yes, it was immediately after.  They asked me and they ask[ed] my boyfriend.

(Pl.'s Dep. 33:2–34:2.)[16]  Nor did he indicate that the "first time" he gave the officers a false

name was the only time he did so.  As such, Plaintiff's testimony is incomplete, and it provides

---

[15]  "A person is guilty of false personation when *after being informed of the consequences* of such act, he or she knowingly misrepresents his or her actual name . . . ."  N.Y. Penal Law § 190.23 (emphasis added).

[16]  By contrast, the Case Report that references Plaintiff's misidentification states:
> The defendant . . . was asked pedigree information including his name and date of birth while at the scene of the arrest.  The defendant was advised several times that it is a crime to provide false information to the police.  The defendant reiterated, and purposely stated that his name was Roberto Cruz and [he] was born on 02/02/1985.

(Case Report 3.)  Plaintiff has not presented admissible evidence directly contradicting this content to create a material issue of fact.

no evidence that he gave a false name only once or that he made the correction after he was warned of the consequences for doing so. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) ("Summary judgment is proper where there is 'nothing in the record to support [the] plaintiff's allegations other than [the] plaintiff's own contradictory and incomplete testimony.'" (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005))). Moreover, Plaintiff's testimony is insufficient to rebut the presumption of probable cause because it does not show that the prosecutor's information was "the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith." *Debrosse*, 739 F. App'x at 50 (quoting *Bermudez*, 790 F.3d at 377).

## 2.   Robbery charge

### A.   Continuing probable cause

The probable cause analysis conducted above regarding Plaintiff's false arrest claims demonstrates that the officers had probable cause to arrest Plaintiff for the robbery charge, which probable cause also defeats Plaintiff's malicious prosecution claim.

The existence of probable cause in a malicious prosecution suit is determined at the time the prosecution is commenced, *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004), and requires "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty," *Stansbury*, 721 F.3d at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). "[C]ontinuing probable cause is a complete defense to a constitutional or New York tort claim for malicious prosecution." *Spagnuolo*, 814 F. App'x at 617. "'[P]robable cause [may] dissipate' after an arrest if 'the groundless nature of the charges [is] made apparent by the discovery of some intervening fact.'" *Moore v. City of New York*, 854 F. App'x 397, 399 (2d Cir. 2021) (second and third alterations in original) (quoting *Lowth*, 82 F.3d at 571).

23

In his opposition, Plaintiff relies on his arguments regarding probable cause for his arrest to support his claim that the officers lacked probable cause to prosecute him.  (*See* Pl.'s Mem. 12.)  However, the victim's statements made after Plaintiff's arrest support rather than undermine probable cause to prosecute Plaintiff for robbery.  The victim's supporting depositions confirm his eyewitness identifications of Plaintiff and Cruz by identifying the two apprehended suspects as wearing a black jacket and black pants and a grey sweater and grey sweatpants, respectively.  Comparing these statements to the arrest records and Plaintiff's testimony shows, at most, minor discrepancies.  For example, Plaintiff's arrest report shows that Plaintiff was wearing a black jacket and blue jeans instead of a black jacket and black pants.  (Pl. Arrest Report.)  In addition, Cruz's arrest report identifies him as wearing a white hooded sweatshirt with black pants rather than a grey top and bottom, (Cruz Arrest Report), but Plaintiff testified that Cruz was wearing a white sweater and a gray windbreaker, (Pl.'s Dep. 57:7–8).  These minor variations do not exculpate Plaintiff and are insufficient to constitute an intervening fact demonstrating that the robbery charge was groundless.  *See Quinoy v. Pena*, No. 13-CV-1945, 2014 WL 1998239, at *9 (S.D.N.Y. May 13, 2014).

Because Plaintiff cannot overcome the presumption of probable cause to prosecute him for false personation arising from the fact that the grand jury directed the filing of a Prosecutor's Information as to this charge, and because probable cause also existed to prosecute Plaintiff for robbery, Plaintiff's malicious prosecution claims fail.  *See Kee*, 12 F.4th at 166 (noting that for probable cause to be "a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action" (citation omitted)).  Accordingly, the Court grants Defendants' summary judgment motion as to these claims.

### iii.   Abuse of process claims

Defendants argue that Plaintiff's abuse of process claims under federal and state law[17]

should be dismissed because there is no evidence that any Defendant (1) was motivated to do

Plaintiff harm without economic or social excuse or justification, or (2) was seeking some

collateral objective outside the legitimate ends of process.  (Defs.' Mem. 18.)

Plaintiff argues that there are issues of fact for a jury to decide regarding whether

Officers Zummo and Karman stopped, arrested, and prosecuted him because of his race and

because they saw him walking hand in hand and kissing his boyfriend.  (Pl.'s Opp'n 20.)

An abuse of process claim arises under section 1983 when a defendant "(1) employs

regularly issued legal process to compel performance or forbearance of some act[,] (2) with

intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective

that is outside the legitimate ends of the process."  *Hernandez*, 939 F.3d at 203 (quoting *Savino*,

331 F.3d at 76); *see also Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir.

2020) (same).  It is not sufficient to allege that a defendant had an improper motive in initiating

the legal process.  A plaintiff must allege that the legal process was instituted to gain a collateral

objective — that a defendant had "an ulterior *purpose* or *objective*" in pursuing a plaintiff's

prosecution.  *Savino*, 331 F.3d at 77–78 ("Although [the complaint] does allege that . . .

defendants acted with an improper *motive*, [the plaintiff] has not presented any evidence that

they had an ulterior *purpose* or *objective* in facilitating his prosecution."); *Morrison v. Vine*, No.

---

[17]  Although the Amended Complaint fails to identify what constitutional right is implicated for Plaintiff's federal cause of action, malicious abuse of process in the criminal context concerns procedural due process rights and therefore may be pursued under section 1983. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (stating that "[i]n the criminal context, malicious abuse of process is 'by definition a denial of procedural due process'" and "hold[ing] that section 1983 liability may lie for malicious abuse of criminal process" (quoting *Jennings v. Shuman*, 567 F.2d 1213, 1220 (3d Cir. 1977))).

17-CV-996, 2021 WL 1229558, at *4 (W.D.N.Y. Feb. 25, 2021) ("[T]he Second Circuit expressly distinguishes between a 'malicious motive' and an 'improper purpose'; only the latter suffices to meet the 'collateral objective' prong of the abuse of process standard." (quoting *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), *aff'd*, 523 F. App'x 770 (2d Cir. 2013))); *Grytsyk v. Morales*, No. 19-CV-3470, 2021 WL 1531225, at *26 (S.D.N.Y. Apr. 19, 2021) ("The crux of a malicious abuse of process claim is the collateral objective element." (quoting *Kraft v. City of New York*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011))); *Scott v. City of New York*, No. 16-CV-834, 2020 WL 208915, at *12 (E.D.N.Y. Jan. 14, 2020) (stating that, to succeed on an abuse of process claim, a plaintiff "must prove that the [i]ndividual [d]efendants acted not merely with an improper motive, but to achieve an improper purpose").  "Examples of ulterior or collateral purposes include 'the infliction of economic harm, extortion, blackmail, and retribution.'"  *Tojek v. Harris*, No. 19-CV-1470, 2021 U.S. Dist. LEXIS 183614, at *27 (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010)).  *See generally TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010) (finding allegations that the defendants had the individual plaintiff arrested to intimidate and frustrate the plaintiffs "and thereby obtain an advantage over them in the ongoing contractual and construction disputes" sufficient to state collateral objective on motion to dismiss).  "Put differently, 'abuse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates.'"  *Tojek*, 2021 U.S. Dist. LEXIS 183614, at *26–27 (quoting *Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017)).  The causes of action under section 1983 and New York law are analyzed under the same standards.  *See Tuccillo v. County of Nassau*, 723 F. App'x 81, 82 (2d Cir. 2018).

In his sole paragraph opposing dismissal of these claims, Plaintiff offers no collateral objective pursued by Defendants but rather states summarily that there is a material issue of fact as to whether he was stopped, arrested, and prosecuted because of his race and because he was kissing and walking hand in hand with his boyfriend.  (Pl.'s Opp'n 20.)   Construing these arguments broadly to suggest that Defendants sought to punish Plaintiff for his race or sexual orientation, such motives do not constitute a collateral objective sufficient to establish an abuse of process claim.  *Coleman v. City of New York*, 585 F. App'x 787, 788 (2d Cir. 2014) ("[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." (quoting *Savino*, 331 F.3d at 77)); *see also Pinter v. City of New York*, 976 F. Supp. 2d 539, 568 (S.D.N.Y. 2013) ("[T]he proper use of legal process based on an improper or malicious *motive* such as a desire for retaliation is insufficient to satisfy the 'collateral objective' requirement.").  At most, Plaintiff claims that Defendants had an improper motive for their actions, which is insufficient to establish a claim.  *Savino*, 331 F.3d at 78 (finding no abuse of process where the plaintiff alleged that the motive for investigation and arrest was to seek "vindication" for the City's political embarrassment and to punish the plaintiff for his "lawfully and properly earned overtime compensation").

Because Plaintiff has not demonstrated any collateral objective held by any Defendant, his abuse of process claims fail.  The Court therefore grants Defendants' motion for summary judgment as to these claims.

### iv.   Fabricated evidence claim

Defendants argue that Plaintiff's claim of fabricated evidence must be dismissed because there is no evidence that Defendants "utilized false evidence or proffered false testimony against [P]laintiff."  (Defs.' Mem. 19.)

Plaintiff contends that Defendants' argument is a factual one as Officers Karman and Zummo falsely claimed to have found the screwdriver.  (Pl.'s Opp'n 21.)

To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that: "(1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee*, 12 F.4th at 168; *Ganek v. Leibowitz*, 874 F.3d 73, 90 (2d Cir. 2017); *see also Soomro v. City of New York*, 739 F. App'x 51, 54 (2d Cir. 2018) (same).  The Second Circuit has held that a section 1983 plaintiff may sue an officer for denial of the right to fair trial based on the fabrication of information when the allegedly fabricated information "is the officer's own account of his or her observations of alleged criminal activity, which he or she then conveys to a prosecutor."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016).

Unlike a false arrest or malicious prosecution claim, "'[p]robable cause is not a defense' to a claim for a denial of the right to a fair trial" based on the fabrication of evidence.  *Id.* at 277 (alteration in original) (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012)).  Qualified immunity is also unavailable on "a claim for denial of the right of a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find."  *Morse v. Fusto*, 804 F.3d 538, 545 (2d Cir. 2015).

28

Plaintiff's opposition papers argue only that Officers Karman and Zummo "falsely claimed to have found a screwdriver near [P]laintiff, concocted fake photographs of a screwdriver, and forwarded the information and photographs to prosecutors." (Pl.'s Opp'n 21.) Plaintiff argues that Officer Zummo's sworn testimony regarding his discovery of the screwdriver, (*see* Defs.' 56.1 ¶ 17), is contradicted by testimony from Officer Price that he searched the area and did not find it, (*see* Pl.'s 56.1 Resp. ¶ 17). Plaintiff's opposition papers, however, make no mention of Officer Price or his testimony. Nor does Plaintiff explain his theory regarding the import of Officer Price's testimony. Drawing all inferences in Plaintiff's favor, even if he had argued that Officer Price's testimony created a material issue of fact, the mere fact that another officer, during a late-night search in tall grass, was unable to locate the screwdriver, does not contradict evidence that Officer Zummo found the screwdriver, nor does it constitute evidence that Office Zummo affirmatively planted the evidence. Plaintiff also makes the conclusory allegation that Zummo and Karman "created false evidence by placing a screwdriver on the ground so that it could be photographed," citing the police photographs of the screwdriver *in situ* as his only evidence. (*See* Pl.'s 56.1 ¶ 3.)

While summary judgment may be denied where a plaintiff contradicts the purported falsity with the plaintiff's own sworn testimony, *see, e.g.*, *Marom v. Blanco*, No. 15-CV-2017, 2019 WL 3338141, at *9 (S.D.N.Y. July 25, 2019) (denying summary judgment on fair trial claim where the defendant testified that the plaintiff resisted arrest in various ways and the plaintiff gave contradicting testimony that she did not resist arrest because "[t]his testimony creates a triable issue with respect to the element of fabrication" (citing *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019))); *see also Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (denying motion for summary judgment and noting that "[a]lthough there was certainly

not overwhelming evidence of falsification, a reasonable jury would be entitled to credit [the

plaintiff's] testimony and reject [the defendant officer's]"), Plaintiff fails to present any sworn

testimony, either at his deposition or by affidavit, on any factual point regarding the screwdriver

that would create a genuine issue of material fact.  For example, there is no sworn statement that

Plaintiff claims that he was not the owner of the screwdriver recovered at the scene, or that he

did not place or throw it there, or that he saw Officer Zummo or any officer place it in the grass.

Because Plaintiff fails to point to any evidence that the evidence of the screwdriver was

fabricated, his claim fails.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's

fabricated evidence claim.

### v.   Denial of medical care claim

Defendants argue that there is no evidence that they denied Plaintiff medical care and

that, because he never expressed a need for medical care while at the precinct, there is also no

evidence of deliberate indifference by Defendants.  (Defs.' Mem. 19–20.)

Plaintiff argues that, while at the precinct, he repeatedly told Defendants he was having

"a massive anxiety attack" and needed his psychiatric medications, and also repeatedly told them

he was "having an asthma attack and needed Albuterol," but Defendants failed to provide him

with medication and prompt medical treatment.  (*See* Pl.'s Opp'n 21–22.)

To establish a claim of deliberate indifference to a serious medical condition, a plaintiff

"must meet two requirements: (1) that [the] [p]laintiff[] had a serious medical need . . . , and

(2) that the [d]efendants acted with deliberate indifference to such need[]."  *Charles v. Orange

County*, 925 F.3d 73, 86 (2d Cir. 2019) (first citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976);

and then citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)); *Darby v. Greenman*, 14 F.4th

30

124, 128 (2d Cir. 2021) ("Deliberate indifference requires, at a minimum, 'culpable recklessness, *i.e.*, an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm.'" (quoting *Charles*, 925 F.3d at 87)); *Adamson v. Miller*, 808 F. App'x 14, 18 (2d Cir. 2020) (holding that to prevail on a Fourteenth Amendment deliberate indifference claim, a plaintiff must prove "(1) that the alleged deprivation [of medical treatment] 'pose[d] an unreasonable risk of serious damage to his health,' and (2) 'that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed'" (second alteration in original) (quoting *Darnell*, 849 F.3d at 30, 35)); *Darnell*, 849 F.3d at 29 ("[A] pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a '*mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions."); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (to state a claim of deliberate indifference, a plaintiff must sufficiently allege (1) that he had an objectively "serious medical condition," and (2) that this condition was met with subjective "deliberate indifference" on the part of prison officials).

To satisfy the objective prong — a serious medical condition — "the deprivation of medical care must be '"sufficiently serious," in the sense that "a condition of urgency, one that may produce death, degeneration, or extreme pain" exists.'" *Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *Charles*, 925 F.3d at 86; *Warren v. City of N.Y. Dep't of Corr. Med. Staff*, No. 17-CV-1125, 2021 WL 1163105, at *15 (E.D.N.Y. Mar. 26, 2021) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the

unnecessary and wanton infliction of pain.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998))).  "When the basis for a prisoner's . . . claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court examines whether the delay itself created a risk of harm.  *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003).  "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'"  *Darnell*, 849 F.3d at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).  To determine whether the plaintiff's medical need is sufficiently serious to establish the basis for a claim of deliberate indifference, the court should consider "whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'"  *Turner v. Correct Care Sols.*, No. 18-CV-3370, 2019 WL 1115857, at *7 (S.D.N.Y. Mar. 11, 2019) (alteration in original) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)), *appeal dismissed sub nom. Turner v. Ulloa*, No. 19-CV-684, 2019 WL 2558917 (2d Cir. May 9, 2019); *see also Dunham v. City of New York*, No. 11-CV-1223, 2021 WL 918373, at *10 (S.D.N.Y. Mar. 10, 2021) ("Only 'a significant delay in medical treatment' provided to an injured arrestee may 'ris[e] to the level of constitutional injury.'" (alteration in original) (quoting *Ricks v. O'Hanlon*, No. 07-CV-9849, 2010 WL 245550, at *8 (S.D.N.Y. Jan. 19, 2010))); *Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) ("[W]here a plaintiff's claim is 'based on temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the [detainee].'" (quoting *Smith*, 316 F.3d at 186)).

"[T]he 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim [under

the Fourteenth Amendment] is defined objectively." *Darnell*, 849 F.3d at 35. Therefore, "to

establish a claim for deliberate indifference to conditions of confinement . . . , the pretrial

detainee must prove that the defendant-official acted intentionally to impose the alleged

condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition

posed to the pretrial detainee even though the defendant-official knew, or should have known,

that the condition posed an excessive risk to health or safety." *Id.* "[A] detainee asserting a

Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either

that the defendants *knew* that failing to provide the complained of medical treatment would pose

a substantial risk to his health or that the defendants *should have known* that failing to provide

the omitted medical treatment would pose a substantial risk to the detainee's health." *Darby*, 14

F.4th at 128 (alteration in original) (quoting *Charles*, 925 F.3d at 87); *see also Ellington v.

Whiting*, 807 F. App'x 67, 69 (2d Cir. 2020) (same); *Dumel v. Westchester County*, No. 19-CV-

2161, 2021 WL 738365, at *9 (S.D.N.Y. Feb. 25, 2021) ("'[T]he second element of a deliberate

indifference claim under the Fourteenth Amendment' — the so-called 'mens rea prong' — is

now '"defined objectively," and a plaintiff is not required to show subjective awareness by the

defendant that "[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk

of harm."'" (alteration in original) (quoting *Ryan v. County of Nassau*, No. 12-CV-5343, 2018

WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018))); *Cook v. Artus*, No. 15-CV-272, 2019 WL

5698956, at *5 (W.D.N.Y. Mar. 26, 2019) (denying the defendant's motion for summary

judgment in finding that the "plaintiff's cracked ribs posed a sufficiently serious medical

condition such that [the defendant's] failure to treat it" created a dispute of material fact

regarding the defendant's deliberate indifference to the plaintiff's medical need), *report and*

*recommendation adopted sub nom. Cook v. Dunbar*, 2019 WL 5695820 (W.D.N.Y. Nov. 4, 2019).

Defendants contend that there is no evidence that Plaintiff was denied medical care or that Defendants acted with deliberate indifference to Plaintiff's medical needs because both Officers Nash and DiPasquale testified that, while at the precinct, Plaintiff did not complain "of any illnesses, not feeling well, wanting medical treatment or wanting any medication." (Defs.' Mem. 20.) Plaintiff testified to the contrary, stating that he kept asking for his medication and that he told the officers he had anxiety and was "having [an] asthma attack." (Pl.'s Dep. 40:3–8, 41:9–17, 42:21–25.) Although Defendants testified that Plaintiff did not make them aware of his medical condition, they do not dispute the fact that Plaintiff was not provided his medication at the precinct. Therefore, drawing all factual inferences in Plaintiff's favor, there is a material question of fact regarding whether Plaintiff made Defendants aware of his serious medical conditions such that they acted with deliberate indifference to his medical needs in failing to provide his medications.[18] A jury, not the Court, must resolve this dispute.

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's claim for denial of medical care.

---

[18] Although Defendants do not argue that the medical conditions claimed by Plaintiff were not "serious," both anxiety and suffering an asthma attack may, depending on the circumstances, constitute serious conditions. *See Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) ("Depending on their severity, psychiatric or psychological conditions can present serious medical needs."); *Warren v. City of N.Y. Dep't of Corr. Med. Staff*, No. 17-CV-1125, 2021 WL 1163105, at *8 (E.D.N.Y. Mar. 26, 2021) (finding that, as opposed to having an asthmatic condition, "an actual asthma attack, depending on the severity, may be a serious medical condition").

### vi.    Excessive force, assault, and battery claims

Defendants argue that Plaintiff's federal excessive force claim and related state law

assault and battery claims fail because there is no evidence that excessive physical force was

used against Plaintiff.  In support, Defendants argue that the only physical force used against

Plaintiff was the minimal amount used by Officers Nash and DiPasquale in holding Plaintiff's

head down when he was striking the side of his face against the ground in the park, and this force

was reasonable and necessary under the circumstances to prevent Plaintiff from harming himself.

(Defs.' Mem. 11, 33.)

Plaintiff claims that Defendants used excessive force against him in violation of his

constitutional rights and state law and argues that there are material issues of disputed facts,

noting that Defendants completely ignored his testimony that he was assaulted by all the officers

at the precinct and by Officers DiPasquale and Nash in the park.  (Pl.'s Opp'n 7, 24.)

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and

whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness'

standard."  *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015); *Williams v. Nat'l R.R.*

*Passenger Corp. (Amtrak)*, 830 F. App'x 46, 48–49 (2d Cir. 2020) (alteration omitted) (quoting

*Brown*, 798 F.3d at 100).  "Assault and battery claims under New York law and Fourth

Amendment excessive force claims are evaluated pursuant to the same standard."  *Feaster v. City*

*of Middletown*, No. 16-CV-734, 2016 WL 10570984, at *3 (S.D.N.Y. Nov. 28, 2016) (quoting

*Cosby v. City of White Plains*, No. 04-CV-5829, 2007 WL 853203, at *6 (S.D.N.Y. Feb. 9,

2007)); *see also Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) ("[E]xcept for

§ 1983's requirement that the tort be committed under color of state law, the essential elements

of [excessive force and state law assault and battery claims are] substantially identical."

35

(alterations in original) (quoting *Posr*, 944 F.2d at 94–95)); *Figueroa v. Mazza*, 825 F.3d 89, 105 n.13 (2d Cir. 2016) ("A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable.").

Because the Fourth Amendment's test is one of "objective reasonableness," the inquiry is fact-specific and requires a balancing of various factors. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)). When determining whether the force applied was "reasonable" or "excessive," a court must analyze the totality of the circumstances facing the officer and consider: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Williams*, 830 F. App'x at 49 (first quoting *Tracy*, 623 F.3d at 96; and then citing *Brown*, 798 F.3d at 100); *see also Concepcion v. N.Y.C. Dep't of Educ.*, 836 F. App'x 27, 30 (2d Cir. 2020). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy*, 623 F.3d at 96 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968))). Courts must therefore "evaluate the record 'from the perspective of a reasonable officer at the scene, rather than with the [twenty–twenty] vision of hindsight.'" *Tracy*, 623 F.3d at 96 (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)); *Feaster*, 2016 WL 10570984, at *3 ("Under federal or state law, a plaintiff alleging excessive force must demonstrate that 'the amount of force used was objectively unreasonable' when considered from 'the perspective of the officer at the time of

the arrest.'" (quoting *Cosby*, 2007 WL 853203, at *6)).  "[G]ranting summary judgment against a

plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could

conclude that the officers' conduct was objectively unreasonable."  *Concepcion*, 836 F. App'x at

30 (alteration in original) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123

(2d Cir. 2004)).

     Defendants argue that they used only the force necessary to restrain Plaintiff from self-

harm after they removed him from the car in the park.  (Def.'s Mem. 11, 33.)  They do not argue

that Plaintiff was uninjured, and it is undisputed that he suffered injuries, including a fractured

jaw.  Plaintiff argues that he was assaulted in the detention cell and again during the ride to

NUMC.  (Pl.'s Opp'n 7, 24.)  Because of the disputed material facts, a jury, not the Court, must

decide Plaintiff's excessive force, assault, and battery claims.[19]

     Accordingly, the Court denies Defendants' summary judgment motion as to Plaintiff's

excessive force, assault, and battery claims.

### vii.   Failure to intervene claim

     Defendants assert that Plaintiff's failure to intervene claim should be dismissed because

(1) there can be no failure to intervene claim since Plaintiff is claiming that each of the

Defendant officers participated in the alleged assault at the precinct and thus is proceeding on the

theory of direct participation by all the individual Defendants, and (2) there is no evidence of any

violation of constitutional rights and thus no obligation by a defendant to intervene.  (*See* Defs.'

Mem. 22–23.)

---

[19]  Defendants do not seek qualified immunity regarding the excessive force claims and, based on the facts viewed in the light most favorable to Plaintiff, are not entitled to qualified immunity on these claims.

Plaintiff claims that each individual Defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent violations of his constitutional rights and maintains that he is permitted to plead in the alternative, as a jury could find that all Defendants participated in the attacks or that some participated while others failed to intervene.[20]   (*See* Pl.'s Opp'n 22–24.)

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases)); *see also Theodat v. City of New York*, 818 F. App'x 79, 82 (2d Cir. 2020) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (quoting *Anderson*, 17 F.3d at 557)).  An officer may be liable for the preventable harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it." *Figueroa*, 825 F.3d at 106; *see also Terebesi*, 764 F.3d at 244.  However, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim under § 1983." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)); *see also Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying

---

[20]  Plaintiff contends that he is bringing two failure to intervene claims, including (1) "against all four defendants in regard to the assault in the cell at the precinct," and (2) "against [Officers] Nash and DiPasquale in regard to false arrest and in regard to malicious prosecution on the robbery charge ([Officers] Zummo and Karman were direct participants in both)."  (Pl.'s Opp'n 23.)  However, because the Court dismisses Plaintiff's false arrest and malicious prosecution claims, the Court also dismisses Plaintiff's related failure to intervene claims.  The Court therefore considers only Plaintiff's failure to intervene claims related to his excessive force claims.

constitutional claims were properly dismissed, we also affirm the district court's dismissal of [the] plaintiff's failure to intervene claim."); *Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying [it].").

Where a defendant "may be liable under a theory of direct participation, there is no claim" for failure to intervene against that defendant. *Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at *8 n.5 (E.D.N.Y. Feb. 6, 2012); *see also Buchy v. City of White Plains*, No. 14-CV-1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) ("[W]hen a law enforcement officer 'is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable.'" (quoting *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014))).  However, "[i]t is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation." *Polanco v. City of New York*, No. 14-CV-7986, 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018).  While a single defendant "may not ultimately be held liable both for using excessive force and for failing to prevent the use of excessive force," *id.* at *9, a plaintiff may proceed to trial on both claims in the alternative, *see Marshall v. Port Auth. of N.Y. & N.J.*, No. 19-CV-2168, 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020); *Watson v. City of Kingston-Kingston Police Dep't*, No. 15-CV-1356, 2018 WL 4509488, at *4 (N.D.N.Y. Sept. 19, 2018); *Cumberbatch v. Port Auth. of N.Y. & N.J.*, No. 03-CV-749, 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006).

Plaintiff argues that he is pleading in the alternative and that, "[d]epending on how the facts come in at trial," a jury could find that all Defendants participated in the attack, or some participated and some failed to intervene.  (Pl.'s Opp'n 23.)  Defendants do not address

Plaintiff's alternative pleading argument or distinguish the cited cases.  Because Plaintiff can proceed with alternative theories, the Court denies Defendants' motion for summary judgment as to Plaintiff's failure to intervene claim arising from events that took place at the precinct.

    **c.    Section 1981 claim**

Defendants argue that there is "no evidence that any [D]efendant intentionally discriminated against [P]laintiff on the basis of his race, or that any [D]efendant's actions were purposefully discriminatory." (Defs.' Mem. 21.)

Plaintiff claims that Defendants deprived him of constitutional and statutory rights with racial animus in violation of 42 U.S.C. § 1981.  In support, Plaintiff points to his undisputed allegations that Officers Karman and Zummo made two derogatory comments about "all the Spanish guys turning gay" and how that "wasn't right."  (Pl.'s Opp'n 22.)

To state a claim under section 1981, a plaintiff must allege that "(1) [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute."  *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (alteration in original) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam)); *see also DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 68 (E.D.N.Y. 2019) (same).  The Second Circuit has determined, however, that section 1981 "does not provide a separate private right of action against state actors."  *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018); *see also Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021) (reaffirming *Duplan*'s holding).  "[T]he express cause of action for damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental

units." *Smalls*, 10 F.4th at 145 (quoting *Duplan*, 888 F.3d at 619); *Duplan*, 888 F.3d at 619

(quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)).

Because Defendants were state actors acting in their official capacities, the Court

dismisses Plaintiff's claim under section 1981.

### d.   Municipal liability claim

Plaintiff has abandoned his municipal liability claim.

"Where a partial response to a motion [for summary judgment] is made — *i.e.*,

referencing some claims or defenses but not others . . . in the case of a counseled party, a court

may, when appropriate, infer from a party's partial opposition that relevant claims or defenses

that are not defended have been abandoned." *Dynamic Concepts, Inc. v. Tri-State Surgical*

*Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (alteration in original) (quoting *Jackson*

*v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)); *see also Ziming Shen v. City of New*

*York*, 725 F. App'x 7, 17 (2d Cir. 2018) (affirming the district court's finding that the plaintiff

abandoned claims that she did not address in her opposition to summary judgment); *Curry v.*

*Keefe*, No. 18-CV-208, 2021 WL 1087444, at *6 (D. Vt. Mar. 22, 2021) ("Federal courts may

deem a claim abandoned when a party moves for summary judgment on one claim and the party

opposing summary judgment fails to address the argument in any way." (quoting *Taylor v. City*

*of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003))).  "Even '[w]here abandonment by a

counseled party is not explicit,' a court may infer abandonment 'from the papers and

circumstances viewed as a whole.'" *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016)

(alteration in original) (quoting *Jackson*, 766 F.3d at 196).

While Plaintiff did not formally withdraw his claim against Nassau County for municipal

liability under *Monell*, he neither mentions this claim nor responds to Defendants' arguments in

support of dismissal.  (Defs.' Reply 1.  *See generally* Pl.'s Opp'n.)  Accordingly, the Court

dismisses Plaintiff's municipal liability claim as abandoned.  *See Jackson*, 766 F.3d at 198

(holding that "in the case of a counseled party, a court may, when appropriate, infer from a

party's partial opposition [to summary judgment] that relevant claims or defenses that are not

defended have been abandoned"); *see also Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 11 (2d Cir.

2020) ("We have in the past expressly approved of this practice in the context of summary

judgment motions." (citing *Jackson*, 766 F.3d at 198)); *Maher v. All. Mortg. Banking Corp.*, 650

F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009) (collecting cases and stating "[f]ederal courts may

deem a claim abandoned when a party moves for summary judgment on one ground and the

party opposing summary judgment fails to address the argument in any way" (quoting *Taylor*,

269 F. Supp. 2d at 75)).

Because this is Plaintiff's sole claim asserted against Nassau County, the Court also

dismisses Nassau County from this action.[21]

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as

to Plaintiff's federal and state claims for false arrest, federal and state claims for malicious

prosecution, federal and state claims for malicious abuse of process, federal claim for fabrication

of evidence, federal claim for racial discrimination under 42 U.S.C. § 1981, federal claim for

municipal liability, and federal claims for general constitutional violations under 42 U.S.C.

§ 1983.  The Court denies Defendants' motion as to Plaintiff's federal claim for denial of

---

[21]  Plaintiff also failed to oppose Defendants' motion for summary judgment as to his claim seeking generalized relief for "deprivation of federal civil rights under 42 U.S.C. § 1983" and citing six constitutional amendments without factual support.  (Defs.' Reply 1.  *See generally* Pl.'s Opp'n.)  The Court therefore grants Defendants' motion for summary judgment and also dismisses this claim as abandoned.

medical care, federal claim for excessive force, state claims for assault and battery, and federal

claim for failure to intervene based on the alleged excessive force incident at the precinct.

Plaintiff has withdrawn his state law claims for intentional infliction of emotional distress,

negligent infliction of emotional distress, and negligent hiring, retention, training, and

supervision, and those claims are also dismissed.

      The Clerk of the Court is directed to terminate Defendant County of Nassau.

Dated: February 20, 2022
       Brooklyn, New York

                         SO ORDERED:

                           s/ MKB

                        _____

                        MARGO K. BRODIE
                        United States District Judge